UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Case No. 22-13121-MDC |
| MBMK PROPERTY HOLDINGS, CH 11 LLC, | : | Philadelphia, PA<br>May 31, 2023<br>9:21 a.m. |
| A) Motion To Extend Time To Time For Filing Plan Of Reorganization Filed By Mbmk Property Holdings, Llc Represented By Robert B. Eyre | : | |
| B) Status Hearing Scheduled Chapter 11 Plan Small Business Subchapter V Filed By Mbmk Property Holdings, Llc. | : | |
| C) Status Re: Motion For Turnover Of Property For Order Compelling James Paul Of Alps Group, Llc And Agents To Comply With Bankruptcy Code 543(B) Filed By Mbmk Property Holdings, Llc Represented By Robert B. Eyre | : | |
| D) Status Re: Motion To Terminate The Automatic Stay Pursuant to 11 U.S.C. 362(D)(1) For Cause To Allow Secured To Continue To Pursue Its State Law Rights And Remedies . 00, Filed By Wilmington Trust, National Association, Et. Al. Represented By Daniel Wesley Meehan . ** Modified To Match Pdf Document On 1/24/2023 . | : | |

. . . . . . . . . . . . . . . . . .

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | ROBERT B. EYRE, ESQ.<br>STACEY MAIN, ESQ.<br>Law Offices of Foehl & Eyre<br>432 North Easton Road<br>Glenside, PA 19038<br>610-566-5926 |
| For Wilmington Trust: | DAVID P. CANAS, ESQ.<br>BETSY G. STIBLER, ESQ.<br>Gordon Rees Skully Mansukhani<br>4031 Aspen Grove Drive<br>Suite 290<br>Franklin, TN 37067<br>615-772-9002 |
| For Subchapter V Trustee: | LEONA MOGAVERO, ESQ.<br>Friedman Schuman, P.C.<br>275 Commerce Drive<br>Suite 210<br>Fort Washington, PA 19034<br>215-690-3826 |
| For Receiver, James Paul: | ALAN AARONBERG |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

MAY 31, 2023 9:21 A.M.

THE COURT: All right. Next is number 7. And that is MBMK, and there are several matters that are on for today. Well, I think it's a motion to extend time for filing a plan of reorganization. Status hearing for Chapter 11 Small Business Plan and status read the motion for turnover of property. Okay. MBMK.

All right. Counsel for the Debtor.

MR. EYRE: Yes. Robert Eyre of Foehl & Eyre for the Debtor. And my colleague, Stacey Main is here. And my paralegal Keith Smallwood is here as well.

THE COURT: Okay.

MR. EYRE: And I'm sorry, and the Debtors principal, Mohsin Khawaja, I believe is on the phone.

MR. KHAWAJA: Hi. Good morning, Your Honor.

THE COURT: Good morning. So we have the Debtors counsel, co-counsel. Who is Mr. Small again?

MR. EYRE: Mr. Smallwood is our paralegal.

THE COURT: Okay. And Mr. Khawaja the principle representative is here for the Debtor.

Who else is here on these matters?

MR. CANAS: Your Honor, David Canas on behalf of the primary sole secured creditor, Wilmington Trust. From the law firm of Gordon & Rees. My colleague, Betsy Stibler, is also on the line with us as well.

THE COURT: I'm sorry?

UNIDENTIFIED SPEAKER: Good morning, Your Honor.

MS. MOGAVERO: Leona Mogavero, Subchapter V Trustee.

THE COURT: All right. Now, for WSS (sic) I heard David, but I did not hear the last name.

MR. CANAS: Yes, Your Honor. The last name is Canas. It's spelled C-A-N-A-S.

THE COURT: All right. And Ms. Dibbler is your co-counsel?

MR. CANAS: Yes, Your Honor.

THE COURT: All right. Then we have Ms. Mogavero for the Chapter 5 Trustee. Who else is here?

MR. AARONBERG: Good morning, Your Honor. Alan Aaronberg. I'm the attorney for the receiver Jim Paul, who is the state court appointed receiver in this matter. And he's on the phone as well.

THE COURT: And who's the --

MR. PAUL: Good morning, Your Honor.

THE COURT: Um-hum. And who is the state appointed receiver? His name?

MR. AARONBERG: James Paul.

MR. PAUL: James Paul.

THE COURT: James Paul. Okay. Receiver. Okay. All right. There are three matters -- three matters listed for today. Which one would we like to begin with?

Mr. Eyre, all of these are your motions, so which one would you like to start with?

MR. EYRE: Yes, Your Honor. I think I want to start with a little clarification. You had referred to a motion to extend time to file a plan. That's moot. That was granted and we filed a plan. So there's a plan filed. Today was originally a status conference on -- actually is originally a hearing on a motion for relief from the stay.

THE COURT: Right.

MR. EYRE: The turnover motion regarding the receiver and the plan confirmation process.

THE COURT: Okay.

MR. EYRE: We then filed a motion for expedited hearing on the turnover motion because of some recent discoveries and concerns about the condition of the properties. And we wanted to expedite the resolution of the turnover motion. And that was added to the list today to -- I think Your Honor was going to address the scheduling of that hearing on the turnover motion.

THE COURT: Okay. So with respect to A, you filed the plan. With respect to B, you don't need a CRS because it's already filed. Am I correct?

MR. EYRE: That's correct.

THE COURT: All right. So the only matter that remains is the C matter, which is a motion for turnover. And --

MR. EYRE: Well, there's also the related motions for relief from the stay and the plan confirmation process. The idea was to address --

THE COURT: Well --

MR. EYRE: I'm sorry.

THE COURT: Wait a minute. Okay. Then we have the C matter. Hold on. We have A, B -- where's C at? C is -- hold on. Hold on. We have the A matter, the B matter. C is the status on the motion for relief. I need the motion for turnover. And then D is the status -- again, a status on the motion to terminate the stay. And is there an E matter? I think that's it.

MR. EYRE: Your Honor, if I -- Robert Eyre. I would say the E matter would be -- we would, because I think it relates to the stay termination issue. We'd like to schedule a process for plan confirmation.

THE COURT: Well, that's not -- well, okay. But that's not on my list. So you want -- when was the plan filed?

MR. EYRE: 26th of April.

THE COURT: April 26. And what is the normal process when you file a motion? Because this is Chapter 5. You got --

MR. EYRE: Subchapter V.

THE COURT: You got -- yeah. So isn't there a process for getting all of these hearing dates lined up?

MR. EYRE: I think the process is to have a

conference with the Court to set dates for the -- for circulating and submission of acceptance or rejection of the plan. And then a confirmation hearing. And the idea was to coordinate that with the hearing on motion for relief from the stay. And initially the turnover motion, but we have since asked the turnover motion be expedited, if that makes sense.

THE COURT: Okay. So I don't -- I mean, typically to get a request -- I mean, in the Chapter 5, do we automatically set a scheduling or counsel asks for it? I know in, you know, regular -- we just file a notice that they file and then we get a hearing date on the disclosure statement.

UNIDENTIFIED SPEAKER: Usually, I've seen counsel schedule the hearing.

MS. MOGAVERO: And Your Honor, Leona Mogavero. Subchapter V Trustee. I've seen this handled a couple of ways, since there isn't any built in, unlike a regular Chapter -- a regular Chapter 11, where you're filing your disclosure statement, and then there's automatically a hearing on the disclosure statement. There doesn't seem to be any built in sort of predetermined mechanism for this.

So what I've seen in some cases is where there's a status hearing at the time of the status hearing, if a plan has already been filed, the court will then schedule a confirmation process, you know, enter an order regarding confirmation process with deadlines dates by which the plan has to be mailed

out, validating objections, confirmation hearing, et cetera.

Other times, I've actually seen counsel for the Debtor file a motion, and the motion asks that the court establish those dates. So there are the two ways that I've seen it done. But you know, there isn't any, you know, predetermined mechanism in the code for how this gets accomplished. And it's a little bit, you know, of an ad hoc basis.

THE COURT: Right. Well --

MS. MOGAVERO: Well, today we have a status hearing, so maybe it would be appropriate for the Court, since we've got a status hearing today. Maybe it would be appropriate for the Court to add that status hearing, you know, since the plan has been filed, enter an order fixing those dates.

THE COURT: Right. I mean, at the initial 60-day status, I have rarely seen one where the plan has been filed. So I have never issued one at that time. I've typically seen where the plan is filed, that there's a request made. So I was just trying to ascertain whether -- and I'm going to just make my own -- I'm going to set up my own process since there isn't seem to be -- I've never had to really think about it because it's always been planned file requests made.

All right. Now, for the matter with respect to the motion for turnover and motion to terminate the stay. I need -- so it seems to me -- and I'm trying to figure out, when was the

motion for turnover filed? January 2nd?
MR. EYRE: Yeah, the motion for turnover is January 2nd. Yes.
THE COURT: And when was the motion for to terminate the stay filed?
MR. CANAS: Your Honor, David Canas on behalf of Wilmington Trust. I believe we filed that -- we filed a response to the Debtor's motion for turnover on January 17. And I believe our stay relief motion was filed a day or two after, perhaps the 19th of January. And the response to the turnover also requested the affirmative relief to be -- to excuse the trustee from the obligation of turnover under 543(d)(1).
THE COURT: Well, I'm just trying to figure out --
MS. MOGAVERO: I'm sorry. Not the trustee. Just to qualify. Not the trustee, Your Honor.
MR. CANAS: My apologies. Yes, the receiver.
THE COURT: Just for my own edification, because I thought that was sort of an automatic thing that if you didn't do it, or didn't want to do it you had to come and do something, but that's just from my perspective. That issue isn't before me. Because I always raise that to people. Because at the end of the day, if I decide that you should have turned it over and you didn't, you run whatever risk you run. So it is what it is. Just wanted the time line for my own

edification. All right.

So right now, what appears to me is I need to have on whether though -- whatever is needed to turned over or whether they should be terminated on the -- either be excused from his obligation to turnover the property. Because 5. -- I mean, it's pretty clear what the language is. And so on 540, after notice and hearing, I may excuse the fine. But you know, as I said, it says a custodian sale. It is what it is.

The only issue is, you know, I think for me, is going to be whether turnover is required. And if it was required, am I going to excuse the receiver from not turning it over? So both of those matters seems to me to go hand in hand with the C matter. Anybody see it differently?

MR. EYRE: Agreed, Your Honor. And if I can just -- this is Robert Eyre -- elaborate a little bit on how we got here. I think there -- and it was our expectation that we would address all these issues, turnover, relief from stay, and plan confirmation in one proceeding.

But we did get recent information and that was our perspective on the turnover was, I think, the same as Your Honor's that there had been a motion filed by the creditor to excuse the receiver. But there had been no interim relief concerning the care and the authorization of the custodian to manage the properties and take what other actions needed to be taken in the interim.

We were waiting to deal with all these things in one proceeding; confirmation, turnover, and relief from stay. But when we got into the properties, recently, we made a demand for access. We saw conditions that alarmed us and made us very concerned. And that's why we filed a request for expedited consideration, which I don't think is disputed by anybody. But the issue was scheduling that hearing on the turnover. We think the turnover motion needs to be dealt with immediately.

THE COURT: All right. Anybody think differently?

MR. CANAS: Your Honor, on behalf of -- David Canas on behalf of Wilmington Trust. I had advised Mr. Eyre, and I believe we spoke with the -- Ms. Mogavero as well, that we don't disagree with having the -- that hearing heard separate or before on an expedited basis. But just that we not do that -- you know, not do that today or next week just due to my scheduling.

And we're open to having a discussion with the Court and with counsel on when we can get the turnover issues before the Court because I think it will involve an evidentiary hearing, so the Court is not trying to make this decision based on the one-sided motion filed by Debtor. But there is no disagreement --

THE COURT: Well, I'm not --

MR. CANAS: -- Your Honor, with having the matter heard on an expedited basis.

THE COURT: Well, counsel, every motion is one sided with an answer. I'm not quite sure what you mean. You mean --

MR. CANAS: Well, I'm saying, Your Honor --

THE COURT: -- do --

MR. CANAS: I apologize, Your Honor.

THE COURT: No, I'm just trying to figure out, counsel. You mean, don't do the motion to terminate the stay, or just do the motion for turnover? That's all I'm trying to figure out. Do you mean you believe we should hear them both on an expedited basis or all in the motion for turnover? Because that's all you mentioned. So that's why I'm saying you want yours heard too?

MR. CANAS: Well, Your Honor, if we're going to hear them, I do believe they go hand in hand, as Mr. Eyre has been stating from the beginning. If the Court is going to hear the turnover motion on an expedited basis, then I think it makes sense to have that -- the stay relief heard at the same time.

THE COURT: Okay. So everybody's in agreement that this needs to be done ASAP. Am I hearing --

MR. EYRE: Your Honor, Robert Eyre. I don't agree with the expedited hearing on the motion for relief, because there are discovery issues related to that. And we filed a motion for an expedited hearing on some specific circumstances. We understand, and nobody's disputed this, that the receiver has no license to rent properties in Upper Darby. That 11 of

the properties are in Upper Darby, 11 of the 13. So these properties are not being cared for, not being rented. And we've got squatters in at least two of the properties.

We've got a vacancy rate that appears to have gone from one to three properties to seven. And we're alarmed by this. We've got tenants that -- and I've told my client that he wouldn't have the opportunity to put on testimony at this status conference. But he's getting -- he's being told by tenants that there are conditions that they are very concerned about these properties for themselves and their families. And they -- some of the tenants want to appear before the court. And we told them that that's not within our control.

So we think that that turnover issue, the burden of excusing from turnover is on -- it's their burden. And we just think at this point, that issue of turnover needs to be addressed separately. Relief from the stay, those issues, I think are more in common with confirmation of the plan. And that was our expectation, our anticipation that we've addressed those in connection with confirmation of a plan of reorganization. And we're ready to move forward with that.

THE COURT: Well, don't you think that -- I mean, it seems to me that while there may not have been a request for expedited consideration of the motion to terminate the -- well, the motion to terminate the stay is, I guess, integrally involved with the motions for turnover. Because, presumably --

well, let's assume that I say, you know, the code is clear, you got to turn it over. All right. And you turn it over. Then what? Now I have to hear a motion for to terminate the stay and say, okay, so now one party has control, and then the other party wants to terminate that control. So is that the process that you're proposing is that I hear the turnover motion?

MS. MOGAVERO: Your Honor, if I could just interject one thing. Leona Mogavero, Subchapter V Trustee. I think they're two different issues here with respect to the termination of the receiver or holding the receiver's role in abeyance or something, because that's a state court receiver upon the filing of the Chapter 11 petition.

And I think that's something that probably needs to be addressed on an expedited basis, because, again, the receiver has had control of these properties and we're now, you know, six months post-petition, seven months, whatever it is. I think the relief from the stay or the termination of a stay issue would go to Wilmington Trust ability, not just to control the properties, but to go ahead with foreclosure. So that I think that's kind of a little different issue.

You know, I don't think this is a situation where it's the same as like somebody is holding collateral like a car and turning it over. Because yes, that does kind of resolve the whole thing. This is terminating or holding in abeyance the receiver's involvement. That's one issue, and then a

separate issue in my mind would be Wilmington Trust relief from the stay to go ahead and foreclose or execute on the properties.

THE COURT: Okay.

MR. AARONBERG: Your Honor, Alan Aaronberg, the attorney for the receiver. What I see the problem here is that, you know, the receiver's hands are tied, because there's a stay in effect. So should he go ahead and spend money and do all of these things? I know he has --

THE COURT: Counsel. Counsel.

MR. AARONBERG: -- to preserve the property and protect -- excuse me?

THE COURT: Counsel, what right did the receiver have to continue under 543? How is his hands tied? 543 tells him what he's supposed to do, absent coming to the court and asking the court to relieve him of that obligation. So I'm not quite sure how his hands are tied.

MR. AARONBERG: Well, there is a --

THE COURT: 543 says this is what happens when bankruptcy is filed to a court-appointed receiver. If the receiver does not want to be bound by that, then the receiver comes to court and says something. So I'm not quite sure how his hands are tied?

MR. AARONBERG: Well, the receiver did file in his response to be excused from 543(b), and that --

THE COURT: Well, when --

MR. AARONBERG: -- has never been --

THE COURT: Counsel, he filed a response. Did he come to the Court and file his motion? After notice and hearing the bankruptcy court may excuse compliance.

MR. AARONBERG: Your Honor, the receiver is neutral here.

THE COURT: No, no, no, no, no, no, no. Counsel, that's -- no, no, no, no, no. That's not how this works. How this works is that the code says you do something. If you do not want to do what the code tells you you must do, then you come to the court and you say the code says I have to do this, please excuse me from compliance. And this is why I believe I should be excused.

But as a neutral party, and if you're neutral -- and you're typically neutral as a receiver, you comply. Unless you tell the court why you shouldn't. That's neutral. You don't take a position. I mean, typically I've never -- you know, my experience. And I'm not saying one way or the other, is that when this is filed, receivers say here you go, or the receiver believes there's some basis why they don't have to comply, and they come to the court and say, I shouldn't have to comply.

But that's what you do. You don't say I don't know what to do, because the code has told you what to do. And if you want to be excused from that obligation, you come to the

court and say, I don't want to comply, because I don't think I should. And that's why I was pointing out from the beginning there are these things are sound, they're not optional. And if you say I can't or I shouldn't, then you have to come to the court and say why.

And so you're telling me you responded after the Debtor made a demand or presumably you responded to the Debtor's motion for turnover. And then we're going to get into at a hearing why the receiver did or didn't. And then -- you know, that's the receiver's option to do whatever is asked of the receiver decides to go down. So I think that's really the issue when you get into 543 matters, is that this isn't optional, it says you shall. And that's --

MR. AARONBERG: There's certain -- excuse me, Your Honor, but there are certain exceptions under that section that says that if the property is in disrepair, the receiver can take into its hands that to make sure that the health, safety, and welfare of the tenants --

THE COURT: Where does it say that?

MR. AARONBERG: -- of the property is taken care of.

THE COURT: Counsel, Where does it say that at? I'm looking at -- is it in 543?

MR. AARONBERG: Yeah. Jim. Jim, the receiver. Jim, you have that section handy?

THE COURT: In the code -- wait a minute. In the --

we talking in the bankruptcy code, or what are you referring to?

MR. AARONBERG: Yes. Yeah, in the bankruptcy code, Your Honor.

THE COURT: All right. I'm looking at it. It says a custodian shall deliver -- what section? Because I'm looking where the custodian shall do.

MR. AARONBERG: I don't have it in front of me, but I know I discussed it with the receiver. Jim, do you know --

THE COURT: Counsel, I don't want to know what you discussed. That's legal. Legal. Hold on one second.

MR. AARONBERG: Okay.

THE COURT: Hello. All right.

MR. AARONBERG: Yes.

THE COURT: So counsel, I'm not going to hear that matter now. But I think we need to have an expedited hearing on whether turnover is required or not.

MR. AARONBERG: I agree.

THE COURT: You know, and as I said, the code is pretty clear. And people will act at their own risk. That's all I can tell you. So when is everybody available, because this seems to be a motion between the Debtor and the receiver, and other people can chime in.

But this is really what it is, is because it's a receiver who has control, and the receiver who hasn't turned

this property over. So that's really what this is. And whether Wilmington Trust is entitled to relief on stay to proceed with its rights as a lender are separate and apart from that.

There's this -- I agree with Ms. Mogavero, they are two separate issues. Because even had the receiver turned this stuff over of act or control over these properties to the Debtor initially, that still wouldn't have been anything that precluded or prohibited Wilmington for coming in and say, well, that's all fine and well, but we want relief from the stay to proceed against these properties. Because they're in default. We have a foreclosure. Whatever. Whatever the status is at the time of the filing. I don't know if you -- where you were in the foreclosure process. But we need to have a hearing ASAP on this motion for turnover as a part of --

MR. EYRE: And Your Honor, this is Robert Eyre. I think there was openness, and David, you had given a week in which you were available, and we were available. And I want to be clear, Your Honor. The receiver has not responded to the motion for turnover. The secured creditor did.

THE COURT: Well, the motion is directed to the receiver, so I can see --

MR. AARONBERG: The receiver?

THE COURT: Yes.

MR. AARONBERG: The receiver doesn't care if the

property is turned over, Your Honor. He doesn't care --

THE COURT: Then why didn't he --

MR. AARONBERG: -- the --

THE COURT: Why didn't he do it?

MR. AARONBERG: Well, we -- I mean, why does he wants to turn over the property? I mean, what does Mr. Eyre want? Does he want the keys? I mean, we gave him access to the property. I mean, what does he want?

THE COURT: That's not turnover. Counsel, the rules -- the code says what you're supposed to do. Whether the receiver did or didn't, I don't know what to tell you and why he didn't. That's the receivers decision. The only matter for this Court is whether he was required to do so. And whether he should have been excused from not doing so.

MR. AARONBERG: Right.

THE COURT: And that's it.

MR. AARONBERG: So Judge, I will adopt the response that was filed by the lender in this case as to why --

THE COURT: How are you going to --

MR. AARONBERG: -- they were --

THE COURT: Counsel, they're not the respondent. The respondent is the receiver. And then the way this works is the receiver files a response, and maybe the lender adopts that and supports the receiver's position. But the response to the turnover is the receiver's response as to why the receiver did

not comply. That's all --

MR. AARONBERG: Judge, I find that --

THE COURT: Yeah, who is this? Who's speaking?

MR. AARONBERG: This is Alan Aaronberg. If I may say why should the receiver be a court-appointed receiver, state-court receiver be put through the expense of filing a response in bankruptcy court whether the property should be turned over or not? If this Court orders him to turn over the property, they're --

THE COURT: Counsel.

MR. AARONBERG: -- going to turn over the property.

THE COURT: That's not how this works, counsel. How this works is when the bankruptcy was filed, 543 said the receiver has to turn it over. If he opted not to, then he has to respond. Nobody told him not to -- did the code say don't turn it over? He made the decision not to do it. So the Court is not putting him in a position that he has to respond. That's a choice he made when he chose not to turn it over.

I don't know why he did or didn't. But the code is pretty clear that he had to and he opted not to. So because he opted not to, the Debtor filed the motion saying turn it over and the receiver should have said I'm not turning it over because of X. Instead --

MR. PAUL: Your Honor, this --

THE COURT: Instead, what it appears is that the

receiver adopted the position of the lender and said I'm not turning it over because the lender says don't turn it over. And that is not being neutral, counsel, from what I am hearing. So while you may take umbrage with why the receiver should have to file something, it was the action -- inaction by the receiver not to turn it over.

So I'm not forcing him to do anything. The code isn't forcing him to do anything. It said what his responsibility was, and he opted to do something different. I don't know what you want me to tell you. I'm not -- all I'm saying you didn't -- the code says do X. You didn't do X. And now you're telling me well, why should he have to do this? He's neutral. I don't know what to tell you.

MR. PAUL: Your Honor, this Jim Paul. I am the receiver, as you know. What I recall from the case is the Debtor's response, their request was never sent to us for quite a long time, I believe. And we kind of sat on the sidelines in regards to it. Now under the 543 code, safety and health, I preserved the property as best as I can.

Prior to me getting the receivership, the property was in disarray. Tenants would complain constantly in regards to nothing being done. Our reports that were filed initially pointed out every property and the condition and what it would take to bring these properties to tenant ready. So there were many issues. And we've managed this property -- these

properties. We hire brokers to lease the properties in state. And we have been tending to the safety and health issues of the property. But there was a point where the Debtor did not respond to the requests. I'm not a lawyer. I'm a paralegal and I'm a receiver for the court. But what I recall is the request wasn't made for quite a while, I believe.

MR. EYRE: Well, they --

THE COURT: The --

MR. EYRE: Your Honor, this is Robert Eyre. First of all, this wasn't an opportunity for testimony. We just heard a lot of testimony. We dispute all that.

THE COURT: I know.

MR. EYRE: The motion was served, the request was made. Within the first week of the bankruptcy, I think there was correspondence demanding turnover. And frankly, I think there's just been an arrogant disregard for even responding. That'll all come out at the hearing.

THE COURT: Okay. The reason we went down this road, about who said what and what happened is because counsel for the receiver said I'll do whatever the Court tells me to do. And I said, oh, you know, we're neutral, we don't care. So then if they're neutral and we don't care, I'm trying to ascertain why I'm having a hearing. That's all I'm trying to figure out. If the trustee's position is that he doesn't care, and you know, he doesn't really take a position, why are we

having a hearing?

MR. CANAS: Your Honor, please. This is David Canas for Wilmington Trust. Because Wilmington Trust as an interested party, did respond to that motion and asked the court to excuse the receivers turning over the property under 543(d)(1). We did that when we responded to the Debtor's motion.

THE COURT: Okay. So your position is that notwithstanding that the receiver takes no position, that Wilmington Trust has an ability to assert a position for the receiver, because --

MR. CANAS: Yes, Your Honor. And it is not uncommon for the issue of the excuse from 543(d) to come from a secured lender that has an interest in the property. And in this case, the secured lender is essentially the constituency of the Debtor other than Mr. Khawaja on the phone, the equity position. So I believe we do have standing as the party in interest to have raised the objection and an affirmative relief requesting excuse from 543(d)(1) -- or under 543(d)(1).

THE COURT: But counsel, I get all of that. But I'm not quite sure that the receiver asked to be excused. You're asking the receiver to be excused and the consequences --

MR. CANAS: Yes, Your Honor.

THE COURT: And the consequence for the receiver is if I find that he did not have a right to not turn it over,

where does that leave the receiver, because the receiver has never asked to be excused. Never. No motion was filed. Nothing was done until the Debtor took action.

So I'm not quite sure even if I say, okay, that how does that then excuse the receiver from the date of the petition, the date of demand until the Debtor files something. Because up to that point, there is no basis for not complying. So I'm not quite sure who's interest is -- because you're representing the Wilmington interest. Who's representing the receiver's interest? They may not necessarily be the same. And --

MR. CANAS: I don't think the receiver has -- yeah.

THE COURT: The receiver --

MR. CANAS: I don't think the receiver has standing to ask for exception to 5, only the Debtor only the lenders counsel can ask for that.

THE COURT: Counsel, where do you get that from?

MS. MOGAVERO: Your Honor. Your Honor, it's right in Section 543 that it's the receiver's obligation to request the court's permission to be excused from compliance with turnover. I think that's pretty clearly articulated in the code.

THE COURT: Right. And I think a creditor can support that position. But I don't hear a receiver asking to be excused. Counsel has taken the position that oh, the lender can ask that the receiver be excused. I don't know. I haven't

looked at that issue. But the obligation to perform is on the part of the receiver.

And I get it if the receiver comes and says, please, excuse me, and parties support that position and say yes, but I'm not quite sure if someone else other than the party obligated to perform can ask that that party be excused from performance. I haven't looked at the issue. But that's what I'm trying to figure out. What are we having a hearing for if the receiver says I don't care?

MR. EYRE: And Your Honor, Robert Eyre for the Debtor. 543 does allow a creditor to file a motion to excuse the turnover. But our problem is that doesn't excuse the receiver from doing something before this Court. And they've done absolutely nothing. They apparently -- so they're roque. That's our concern. And --

THE COURT: The but I think the code says the receiver do something. And if you --

MR. EYRE: They have to do something. I agree with that. Yes.

THE COURT: They have to turnover, or they have to file a motion to excuse them from turnover. So far, I see nothing from the receiver asking that the receiver be excused. All I see is the Debtor saying you haven't complied, and an objection of telling the receiver to comply in a response from the creditor. I guess the creditor is saying the receiver

should be excused, because I don't see anything about a receiver saying excuse me.

Again, the position that this typically arises in is that the receiver says, excuse me, I don't want to -- I think you should excuse me from 543(b). And everybody else joins in in support. I've never seen one where a motion is filed, the receiver doesn't say anything, and it's the creditor who's pushing it.

I would say I'm supporting. I mean, I see them coming in because they are an interested party on the 107. They come in -- or the 109, whichever section -- and they come in and they say okay, well, we're going to support this. We don't think the receiver should have to comply. Because the code is directed to the receiver. And so it's the receivers obligation to do one of two things. And in this case, the only party who has done anything is the Debtor to say turnover, and the creditor who's objecting and the receiver who hasn't said anything. So I'm not quite sure what I'm having a hearing on.

Is the receiver asking to be excused? Does the receiver want to file something saying please excuse me? Because the receiver hasn't asked for that. They haven't done anything. And I'm hearing the receiver saying -- counsel saying well, we're neutral, we don't care. So if you were neutral and you didn't care, I'm not understanding why you didn't come -- you need to do one of two things, either --

MR. AARONBERG: Your Honor, the only thing the receiver cares about is protecting the property. And other than that and going into motions to modify the stay or whether there's enough equity cushion for the Court to determine whether the stay should be modified, the receiver is neutral.

The receiver has no -- I mean, there's no -- it really doesn't have standing to file anything. It says here that the court after noticing hearing shall protect all entities of which a custodian has become obligated with respect to the property or proceeds. And so in a sense, after noticing hearing, the bankruptcy court may excuse compliance if the --

THE COURT: But you have to ask --

MR. AARONBERG: -- interests of the creditors -- if the interest of the creditors --

THE COURT: Counsel. Counsel.

MR. AARONBERG: Yes.

THE COURT: It says, the custodian shall deliver to the trustee any property of the Debtor, and the Debtor in --

MR. AARONBERG: Okay.

THE COURT: -- this case is the trustee.

MR. AARONBERG: Yes.

THE COURT: And if he does not, he has to file something. And he can't just say, I'm not going to do it and not file something. You're not excused from B. You have to turn it over unless the receiver files something asking the

court to be excused of compliance. How do we get there? How does that get before the court? The way that gets before the court is that the receiver files something saying please excuse compliance.

MR. AARONBERG: That's not how I read it, Judge. It's not how I read it.

THE COURT: Well, counsel --

MR. AARONBERG: I read it that the --

THE COURT: Counsel.

MR. AARONBERG: -- creditor has to file -- yes.

THE COURT: No, counsel. You can read it any way you want. The facts of the matter --

MR. AARONBERG: Well, where does it say that the receiver has to file a motion to be accepted? Where does it say that?

THE COURT: Well, counsel. Well, where does it say that the receiver is excused from compliance with B? Where does it -- how does the receiver get excused from compliance?

MR. AARONBERG: Under -- I'm reading it to you. Under D it says, "After noticing hearing, the bankruptcy court may excuse compliance with A, B, C of this section if the interests of creditors and --

THE COURT: Counsel.

MR. AARONBERG: -- if the Debtor -- yes.

THE COURT: Counsel. How does the -- when this was

filed, the receiver was obligated under B to turn it over.

MR. AARONBERG: I agree. I agree.

THE COURT: And he had no option. None. And if that option was to be exercised, if he was to be excused from his obligation, it was incumbent upon the person who shall turnover to do something. He does not get to say I don't have to comply because I'm going to wait for a creditor to file something. And then if the creditor files something, I get excused. What is the basis --

MR. AARONBERG: Well, if the court rules that way, yes.

THE COURT: No. But counsel, counsel. He had -- there was no excuse for the receiver to comply. When demand was made, he was required to comply. Now, what would have been the basis for noncompliance?

MR. AARONBERG: And that's what I've just read to you.

THE COURT: Counsel, after notice and hearing, and a motion --

MR. AARONBERG: Yes.

THE COURT: -- and notice and hearing, and when did the receiver file something with a notice and a hearing?

MR. AARONBERG: The receiver filed the motion for turnover, and the bank, the creditor or the lender --

THE COURT: Counsel. The Debtor filed -- counsel,

the Debtor filed a motion for turnover, because --

MR. AARONBERG: Yes. Yes. The Debtor filed a motion for turnover.

THE COURT: The receiver -- counsel.

MR. AARONBERG: Yes.

THE COURT: Because the receiver failed to comply. And nowhere has the receiver asked to be excused from compliance. The court may excuse compliance. When does the receiver request that he be excused from compliance?

MR. AARONBERG: I don't see the receivers name requesting --

THE COURT: Counsel. Counsel.

MR. AARONBERG: Okay. Okay. Okay.

THE COURT: To -- obligated to act. He failed to act. So when would he come to the court and ask for excuse for not complying with 543(b)? You're saying it's the secured creditors obligation to come and ask that the receiver be excused?

MR. AARONBERG: Yes.

THE COURT: And counsel, that's not how this works. He didn't comply. And he didn't come -- and he didn't come to the court to ask for excuse. Hasn't even filed anything asking for excuse. The creditor is saying please excuse him. When has he asked to be excused?

MR. AARONBERG: Well, if -- let's say, if the

receiver did file something, that would basically say that the receiver is not neutral in this case. And --

THE COURT: Well, then --

MR. AARONBERG: -- that's why it's --

THE COURT: Counsel, if the receiver was neutral, he should have turned it over. That was what he was obligated to do. Turnover. He isn't neutral, because he took a position by not turning it over. And whether you want to assert he is neutral or not, the code was pretty clear. Turn it over. And unless he had a reason not to turn it over, that's what he was required to do.

And he took a position by not -- this is standard. This is how it always worked when a receiver is appointed and when a bankruptcy is filed. Unless a receiver has some basis, or says I shouldn't have to comply because X and please excuse me, then that's it. But I don't know what you want me to tell you, except he was required to do something, and he didn't. And that's it. And that's why I have a motion.

So my question is, the receiver hasn't filed anything saying why he should be excused. Of course Wilmington has, and Wilmington is saying, well, he shouldn't have to comply. But it isn't Wilmington who is required to perform and comply. It is the receiver. And the reason we're going down this road is because you keep saying the receiver is neutral, he's neutral. He's not. If he was neutral, he would have just turned it over

and said you guys go fight it out. I'm out of here. That's not what happened. He decided that he wasn't turning it over.

MR. AARONBERG: Okay. So we'll do everything -- Your Honor, we'll do everything to turn it over, okay, which I don't know what that means. I mean, we gave them all the reports, all the rent rolls, and so forth and so on. We supplied that to the Debtor's attorney. But now, the creditor has a response on file asking for an excuse. So we'll give it back to the Debtor. And then there should be probably a hearing on the creditor's motion. So I mean, that's --

THE COURT: What creditor's motion?

MR. AARONBERG: -- that's what I think --

THE COURT: The only motion the creditor has is to terminate the stay. Because the way this works, counsel, is that your client, the receiver, was required to turn it over. He would come in and say, I don't want to turn it over because of X, and the receiver -- and Wilmington would say, and don't make him turn it over because we think that, and he's right. We don't think he should have to turn it on.

And that's why I think you're confused, counsel, is that he was obligated to do something, and didn't. And has offered no explanation why he didn't. He hasn't filed anything saying why he didn't. He hasn't asked the Court to excuse him from his failure to turn it over. The only party who's filed something is Wilmington. And Wilmington is saying please

excuse him because of our interest. Because we don't believe the Debtor should have it.

Well, that's a whole different issue as to whether the receiver believes he should have turned it over or not. Clearly, he didn't turn it over because you relied on Wilmington. That's what it appears to me. I don't know why. That's my -- from my look at this. But the Debtor --

MR. AARONBERG: Well, Your Honor --

THE COURT: The receiver has a --

MR. AARONBERG: Excuse me. The receiver isn't privy to facts that would constitute the necessary elements to be excused from complying with this. If you look at the response that was filed by the lender, I mean, the receiver doesn't have that kind of information or the receiver is there because they were appointed by the state court to preserve the property. And then that's it.

THE COURT: And counsel --

MR. AARONBERG: I mean --

THE COURT: And then that -- and then counsel, you have just said why the receiver should have turned it over. Because the receiver only had one job, which was to preserve it pursuant to a state court order. Once the Debtors filed bankruptcy, 543 became the controlling law.

MR. AARONBERG: I agree.

THE COURT: And once that law -- right. And once

that law says what the receiver was required to do, he was required to do it unless he thought there was a reason he didn't have to. And what I'm hearing from you is he had no information as to why he shouldn't have.

MR. AARONBERG: Exactly. Yes.

THE COURT: So then explain why he didn't then?

MR. AARONBERG: Your Honor, I mean, we gave them all the reports. I mean, I don't know what --

THE COURT: Well, counsel, was that -- did you turn in --

MR. AARONBERG: What I'm telling you is I don't know what constitutes turning over the property. Is that -- what does Mr. Eyre want? I don't know. If he gives me a list of what he wants --

THE COURT: Counsel. Turnover means --

MR. AARONBERG: -- we'll give it to him.

THE COURT: Counsel. Turnover means you give it -- you give back everything. You no longer in control. You the receiver. I think it's pretty clear what it means. It's pretty clear what it means. And so I'm not quite sure, counsel, you know, a quick look at Colliers on the 543 would have been a very -- would have would have been enough to say, this is what my client's obligation is. This is how he needs to proceed. And this is why I think we should do what we do. And that's basically it.

I'm not trying to chastise anybody. I'm just a little frustrated, because this has been, why are we having a hearing? If the receiver believes he didn't have a right to keep it, then why are we having a hearing? Because it's the receiver who is excused. I get that Wilmington says if the receiver says I shouldn't have to turn over, I'll support that. But in the first instance, the receiver was required to comply with the -- unless the receiver felt that there was a basis for noncompliance. And I have not heard anything from the receiver saying why I shouldn't have complied. And that's --

MR. AARONBERG: The status quo.

THE COURT: That's not what the 543 allows for.

MR. AARONBERG: I know. I know.

THE COURT: It says you have to. And I haven't heard --

MR. PAUL: Your Honor, the --

THE COURT: Yeah.

MR. PAUL: This is Jim Paul again. We did turn over all the documentation in regards to that. We never got a call in regards to any property management company to manage these facilities.

THE COURT: Well, did you say here's everything, you have X amount of time, come take it over?

MR. PAUL: We --

THE COURT: I mean, I don't know what you guys did.

Listen. This is what I'm going to do. I'm going to set a hearing date. You guys can try to work this out. But you guys already have heard from me what the parameters are, and there's consequences for not complying with the code. And so you can act or behave in any -- you make your decision on how you want to respond. And I will make my decision based on the facts.

But it is pretty clear from this discussion what the code says what the obligations are, and either one or two things happen. And if I'm hearing neutral, I don't understand why the first didn't, but you guys know more. I only know what I hear in court. There may be more things outside that. I don't know. So let's pick a hearing date, and we'll go from there. That's all I can tell you. You guys got a date? You want to get back to me with some dates, but I need it -- Eileen, what dates we have available?

COURTROOM DEPUTY: Let's see. Is this is going to be a Zoom hearing, Judge, or telephonic?

THE COURT: No, we need evidence. So we have to either do Zoom or in person. One of the two.

COURTROOM DEPUTY: All right.

MR. EYRE: Your Honor, Robert Eyre for the Debtor. I believe David Canas indicated previously that the week of June 12th he had some openings. I have openings that week as well, with a couple of exceptions. So if the Court has any dates or times within that week, that might be a good starting place.

MR. CANAS: Well, Your Honor, David Canas. That I agree with Mr. Eyre. I advised him previously that that was the first week that I had availability the week of June 12. Not complete availability, but my calendar is open during that week and subsequent.

THE COURT: Well, then counsel, I'm assuming the receiver is going to come out and say why he shouldn't have to comply. Because that's in the first instance. He has to come and say why he shouldn't have to comply with his obligation and you're going to support that, right?

MR. AARONBERG: I'm going to instruct the receiver to comply. I mean, as far as being the attorney for the receiver, I'm going to tell him to comply. Unless you know --

THE COURT: And why would I tell him not to? I mean, again, this was the receiver's obligation. This only comes to the court when the receiver says I'm not doing it. And this is why I'm not. That's how this works.

MR. AARONBERG: And --

MR. EYRE: Your Honor, and I -- yeah. I'm sorry. Robert Eyre for the Debtor. I agree with Your Honor that no hearing should be necessary here. And I'm hopeful that that will be the result. But we still need a hearing date just in case that result doesn't come about on its own.

THE COURT: Well, I can tell you if we have a hearing, the first thing I'm going to want to hear from is the

receiver why he shouldn't comply. Because that's --
MR. EYRE: Yeah. I get that. I agree.
THE COURT: -- next, and then anybody who wants to support the receiver gets, but they don't get to assert the receivers position. The receiver -- because it's the receivers obligation. And if the receiver is willing to comply with his obligation, I don't get to hear anything. So we're going to pick a date. Let's go. May 12th. I don't have anything. Let's do May 12th.
MR. EYRE: Or June 12th.
MS. MOGAVERO: June 12th.
COURTROOM DEPUTY: What time, Your Honor?
THE COURT: Let's see. Let me calculate, counsel, because I have a standing Monday. Okay. My injection is on the 7th. That means the next one is on -- so June 7th minus 14 days is -- okay, we good. That's fine. Okay.
MR. EYRE: What time is that, Judge?
THE COURT: 10:30.
COURTROOM DEPUTY: June 12th at 10:30, Your Honor?
THE COURT: Right. But I only -- I want to make it clear that I'm going to expect the receiver to show up and say why he shouldn't comply and to file an answer or something.
MR. AARONBERG: If he hasn't done it.
THE COURT: I'm sorry?
MR. AARONBERG: If he hasn't turned it over.

THE COURT: Well, if he has --

MR. AARONBERG: If he's turned --

THE COURT: -- then I don't need to hear it, because there's no motion to compel.

MR. AARONBERG: Right.

THE COURT: All right. So we'll schedule it for June 12th at 10:30. If you guys resolve it, report it to the Court as resolved and I will cancel the hearing. Okay?

Now, that takes us to the motion to terminate the stay. When that motion was filed, was a hearing notice and -- a notice of hearing date listed?

MR. CANAS: No, Your Honor. David Canas, Wilmington Trust. No, Your Honor. We did not and then subsequently we've bumped the -- any hearing whether a preliminary or final hearing just with the other motions that have been pending. So I think we had contemplated that today's status conference would set the hearing and set any deadlines that the Court would have before the hearing.

THE COURT: Okay. When was it? It was filed on January 19th, you said?

MR. CANAS: Your Honor, I know we filed our responses to the turnover motion on the 17th. And they were not simultaneous. I believe the stay relief was a day or two after. Yes, Your Honor. So January --

MS. MOGAVERO: Yeah, it looks like the motion -- Your

Honor, the motion for relief from stay was filed by Wilmington Trust on January 20th.

MR. CANAS: Thank you. Thank you.

THE COURT: All right. So the motion for relief. All right. Is there a discovery needed for this? I heard Mr. Eyre said something about discovery.

MR. EYRE: We needed there.

THE COURT: So we need a discovery order for this?

MR. EYRE: Yes, Your Honor to both questions. And I --

MR. CANAS: And I would agree with that. I'm sorry.

MR. EYRE: Okay. And I think again, the idea was if we could have that -- the idea was to have that run consecutively with the proceeds on confirmation of the plan, because I think the two go the same issues. If we can confirm a plan we --

THE COURT: So counsel, do you agree with that? That this should run with plan confirmation?

MR. CANAS: Your Honor, I do agree that the issues are somewhat similar and what we would attempt to get through discovery and assuming that the schedule of the Debtors plan confirmation is happening relatively soon, I don't have any opposition to having them set at the same time.

THE COURT: Okay. Well, have the parties discussed deadlines? Have you thought about deadlines?

MR. EYRE: Your Honor -- go ahead, David. Sorry.

MR. CANAS: I was going to say I don't know that we've gotten to that point. We have been having discussions on the case as a whole and where we're going and that sort of thing. But I don't know that we've revisited the deadlines recently. But --

THE COURT: Well, what I can do is because, you know, you're not going to get a hearing. Today is May 20- -- May 23rd. May 31st. At the top of my head, I put the 23rd. I don't know what was significant about that. But today is the 31st. And with that being said, counsel, I know we're not going to have a hearing before the end of the month because you know, my -- first of all, you're going to need some discovery.

So I don't know what that means. Does that mean depositions? Does that mean experts? What does it mean? And so I can't give you a date without having some time frame. It's easier with confirmation because confirmation will set X amount of time to go out. I don't even think -- is this a non-consensual plan? So far, right?

MR. EYRE: So far.

MS. MOGAVERO: I think, Your Honor, the parties are hoping for a consensual plan. And I think, based on conversations we had yesterday, the idea would be either that there's -- either there's a consensual plan, in which case there's no reason to move forward with the stay motions, or

it's a nonconsensual plan, and the issues kind of dovetail with the same issues that are related to the motion for relief from stay.

THE COURT: Right. But I'm talking about in terms of timing. When we have confirmation if the motion for relief from stay was not a factor, we would just set the date, and say, okay, we do this by this date, and then we'll have a confirmation hearing. But --

MS. MOGAVERO: Right.

THE COURT: -- you can't do that because right now, it's notwithstanding that we could easily schedule it, we can't, because we have the motion for relief from stay, which is still part of confirmation, which requires some discovery. We're not doing too much discovery when we're doing a confirmation.

So that's why I'm saying it's not as easy for me to just sit here and say, let's do it within 30 days, or how -- I need to know how much time the parties need for discovery. What I would propose is, I can give you some dates. And then you guys, you know, if you say we need 30 days for discovery, and then we can within that time period, we can set a confirmation hearing, you know, 10 days later, or 20 days, whatever. But I can't do that now, because there's a different factor affecting my timing for scheduling confirmation.

MR. EYRE: Your Honor, Rob Eyre for the Debtor. If I

can add this to the discussion. The Debtor is actively involved in negotiations to sell these properties. And we might need to do that on a fairly expedited basis. So what I would -- and we'd prefer to do that under a confirmed plan, but if we could do the alternative of a 363 motion when we get there.

So what I would ask is if we could schedule a confirmation hearing date, and that is -- that allows, you know, 30 days for discovery. And we would try to complete that discovery within 30 days, and then schedule the confirmation hearing as soon thereafter. If there's some reason why we can't do it by then, or if even better, we end up agreeing to everything, then we can advise the Court before that time passes.

THE COURT: Well, that's what I just said, counsel.

MR. EYRE: Okay.

THE COURT: If we're going to do it, 30 days for discovery and do you want confirmation 10 days later? That's what I was trying to contemplate, because --

MR. EYRE: Yes.

THE COURT: -- typically, I would have just said, here's a confirmation date without having to allow time for discovery.

Counsel for Wilmington, is 30 days sufficient for discovery for you?

MR. CANAS: Yes, Your Honor. On that, I think it is if we can have an agreement that the -- I don't know that I want to set a particular day, but that the parties would agree to exchange any written discovery and set any depositions that might need to be taken on an expedited basis and not -- you know, if I get a set of discovery out, I might -- the response time will end before the -- or excuse me, will end after the 30 days.

THE COURT: Right.

MR. CANAS: So as long as there's an acknowledgement that we're doing discovery on an expedited turnaround, then I think that 30 days would work.

THE COURT: Mr. Eyre?

MR. EYRE: I have no objection to that, Your Honor.

THE COURT: All right. So we do 30 days out, which I'm going to say is July 30th. So June 1st, that takes us to July 1st. We obviously not coming -- let me look at -- let me see where I'm at here. July 1st would be the deadline which is actually a Saturday. Okay. Well, we could go to July 3rd, if that works because it's a Monday. That gives you that -- I was working the day before. I'm here. I'm here, but -- and then that would mean we would have -- and we definitely -- I'm not here the last two weeks of July.

I'm probably still going to have hearings, but I'm not quite sure if I want to do a -- I'm going to have routine

hearings. Did we book anything? I'm leaving on the -- when do I go? I leave on Sunday the 16th. And Eileen, did we schedule anything? I mean, as I said some --

COURTROOM DEPUTY: No, Judge.

THE COURT: -- of the things --

COURTROOM DEPUTY: I only have a trustees motions and confirmation scheduled with the trustee on the 20th. But that's just with, you know, me and her. There's nobody else --

THE COURT: Right. And I -- right. And I don't know what my Wi-Fi situation is going to be. So I'm not inclined to do anything until I come back on. I'm back on -- when am I back? Think I'm back on Monday the 31st of July. I'm back. Tuesday, August 1st is when I would start my regular hearings. And I don't see anything -- okay. So I would have the week of August 1st through the 4th. I'm not sure after that, because the 5th, my husband may have plans. Never mind. All right. So the first week. So I have August 1st or the 2nd for the confirmation.

The 2nd is the typical day, right, Eileen? Wednesday?

COURTROOM DEPUTY: Right. Wednesdays for Chapter 11 and 7.

THE COURT: Right. We could schedule it for like 1 -- after my hearings, like 1:00. That would give you guys 1 to 5. That would give you four hours for confirmation. And the

motion for relief. Do you think you need more time than that?

MR. CANAS: No, Your Honor.

MR. EYRE: I think we can get that done, Your Honor. And I apologize. I heard August 1 and 2. Which day were we talking about?

THE COURT: You can have 1, 2, or 3. Either one of them.

MR. CANAS: I'm open on all those, Rob.

THE COURT: Let's do the 2nd, because that'll give me an opportunity. I'm back on the 31st. At least the 1st to read whatever pleadings there are, I'll read them before to the extent there are deadlines to -- because there are already pleading on the motion for relief, correct? There was a motion filed, answer filed. Confirmation.

MR. CANAS: There's no response on the stay relief motion yet.

THE COURT: Okay. So that has to be filed clearly before -- I guess before you guys -- I don't know how you're going to do discovery with no answer. So Mr. Eyre, you got to get that answer in there. Because they're going to -- unless you guys obviously have been speaking. You may already know the defense or the response. So --

MR. CANAS: Not necessarily.

THE COURT: Yeah. So you need to get that on record, so that everybody's on the same page. And then let's do the

2nd at 10:30.

COURTROOM DEPUTY: Judge, we'll probably have other hearings at 10:30.

THE COURT: Oh, that's right. I said at 1:00.

COURTROOM DEPUTY: 1:00. Right.

THE COURT: And 1 p.m. on the 2nd. We'll do confirmation and the motion for relief from stay. It may be that you guys have resolved all of this before then. That's all fine and well. But in the meantime, with respect to these properties, I think there's an issue that needs to be resolved ASAP, which is the safety of the tenants.

And because at the end of the day, the Debtor is going to be liable for whatever, because it's property of the estate, the Debtor and to the -- well, since the receiver is still in place and hasn't turned it over until turnover happens, the receiver is responsible for once this is turned over assuming that's what happens, Mr. Eyre, you need to have the Debtor have insurance and everything else necessary to protect these tenants.

You know, you must -- you sometimes have to be careful what you ask for it because you just might get it. So you need to look at all of those issues. You know, is there insurance on that property right now, on those properties?

MR. EYRE: I understand there is, Your Honor, and I hear what you're saying. We will address all those issues.

THE COURT: Right. They need to be addressed outside of who ultimately gets to control these properties, whether they go back to the bank and get foreclosed on. All of those things in terms of protecting the tenant, meeting their needs, getting management. If the receiver is doing those things when you -- and if the receiver says here you go, you need to have those things in place. Because right now --

MR. EYRE: Understood.

THE COURT: Right now they're the receivers responsibility. And then you guys can fight later about money, because it's always a fight about money. You can figure that out later. But now --

MR. EYRE: Well, we wouldn't be here if that was the case.

THE COURT: Right. Well, I'm talking about specifically the receiver and the receivers payment, which he's entitled to reasonable -- where is the money. Specifically that issue, you know, will either get resolved or I'll hear it. But in the meantime, I am very concerned about tenants safety and protection, not only for the Debtor, but for Wilmington Trust. They're the secured creditor. They want to make sure their interest is protected in these properties.

So I would hope everybody could work together and make sure the tenants are safe, the property is safe. And the only thing we have to fight that I have to hear is a fight

about who gets the property. And that makes it my job easier and makes everybody else's jobs easier. And everybody's rights are protected. Okay?

MR. EYRE: Okay, Your Honor.

THE COURT: All right. Is there anything else with respect to this case, this MBMK that I need to address?

COURTROOM DEPUTY: Judge, this is Eileen. Is counsel going to send out a notice for confirmation and --

THE COURT: Yes.

COURTROOM DEPUTY: -- for the motion for relief?

THE COURT: Counsel for the -- Wilmington sent out a notice of hearing date, the notice that typically goes with the motion say that, you know, give the deadline of a week to file a response. So Mr. Eyre, you got a week. And then the hearing on the motion for stay relief will be August 2nd at 1 p.m.

Mr. Eyre, you're going to send out a notice with respect to this confirmation, which would be on August 2nd at 1 p.m.

MR. EYRE: Your Honor, there needs to be a date. And I can discuss this with the parties, but a date for what people file or what -- we're going to do ballots, in other words.

THE COURT: Right.

MR. EYRE: This is going to code. It's a little unclear. But I think the right thing to do is to circulate ballots.

THE COURT: Well, I guess we can if you want a typical order from -- that goes with a Chapter 11, then you're going to have to have -- ballots would be typically the reported plan voting would be due one week before the confirmation, which would be the week before August 2nd. What's that, Eileen?

COURTROOM DEPUTY: The week of the 2nd is July 22nd.

THE COURT: Okay. So we would need the reporter plan voting by July 26. That is a -- is that a month? What day of the week is that? That is --

COURTROOM DEPUTY: That's a Wednesday.

MS. MOGAVERO: Wednesday. The Wednesday.

THE COURT: Okay. So I would say that ballots and objections would be due on July 24th. Okay. And then --

MR. EYRE: Okay.

THE COURT: -- July 24th at 5 p.m. Because then that gives you -- you know, look, you got your ballots. Everybody voted and they're filing their objections. And then you file your reporter plan voting two days later. Then you can count back 30 days from there, which is typically how long we send out the plan and give people 30 days to vote. That will take us to June 24, which is a Saturday.

So that will take us to June 26 is the deadline for sending out balloting and all the plan information. Okay. And then that gives you -- and then all discovery in the -- and you

could put that in the confirmation -- I mean, in the notice of confirmation. All discovery with respect to the plan objections and the motion for relief shall be -- what's 30 days? June --

MR. CANAS: Your Honor, David Canas for Wilmington.

THE COURT: Um-hum.

MR. CANAS: Your Honor, David Canas for Wilmington Trust. If the Debtor is going to be filing their response in -- you know, in a week or so to the motion for relief, can we have that discovery extended 30 days from that date. With a hearing on August 2nd, I think we've got time. I'm not asking to extend that 30 days, other than give me a chance to see the response before we put anything out.

THE COURT: Right. So if you want to file the response. So in your notice, Mister -- counsel, for the -- for Wilmington.

MR. CANAS: Yes, Your Honor.

THE COURT: In your notice, you're going to say the answer is due by June 9th. That gives them a week. A week --

MR. CANAS: Okay.

THE COURT: -- to file a response.

MR. CANAS: Yes, Your Honor.

THE COURT: Get those in by 1, 2, 3 -- you will cut it off at the June 30th, which is a little less than 30 days. It's 1, 2, 3 weeks. 30 days would be July 7th. But I just set

-- well, we can do that. We could actually give you 30 days to July 7th, and then --

MR. CANAS: Thank you, Your Honor.

THE COURT: -- if we do discovery in -- let me write these down. Discovery in July 7th, right? Which answer due June 9th. So you got 30 days. And then Mr. Eyre, you would have to send out your information by -- I'm trying to work this. If I do it by the 14th, that's not enough. That's not -- 1, 2, 3 -- that's 3 -- when are we having this hearing? August 2nd. That's not going to be 30 days. You need 30 days to get -- I mean, it doesn't have to be 30 days, but we typically try. So that means, Mr. Eyre, that if you sent out -- you will have to send out -- because you want to send out the plan and all of those other things before the August 2nd hearing. That would take us to --

MR. EYRE: Right.

THE COURT: Hold on one sec. Oh, I'm sorry. So counsel, back to the dates. I'm trying to work these dates so that they work for everybody. Where's my calendar? All right. So if we go to July 7th, that's the deadline for discovery. Mr. Eyre, you would have to send out by the 12th the ballot information with -- I'm not -- I mean, all the parties who are interested are involved. So I'm not concerned about people not having sufficient time to read the plan and to vote. Because originally I had -- when did I say voting was going to be due?

That's not going to work. Because if we have --

COURTROOM DEPUTY: July 12th.

THE COURT: That's two weeks. Unless we push the confirmation back to the 9th. What do I have on the 9th, Eileen?

COURTROOM DEPUTY: One moment. Just open up that calendar.

THE COURT: I don't have anything on the 9th. I don't see anything on my calendar. But remember, you know, things aren't updated yet.

COURTROOM DEPUTY: No, I know.

THE COURT: All right. So that will take us to August 9th, or we could do --

COURTROOM DEPUTY: Yeah. August 9th --

THE COURT: Right. August 9th at 1 p.m. would work. And then we work back from August 9th with the reporter plan voting being due on August 2nd. Three report with ballots and objections due July -- or is August 1st that Monday? No, July 31st would be the deadlines for balloting and objection. And then we count back from July 31st. And I'm trying to look in -- 1, 2 --

COURTROOM DEPUTY: How many days?

THE COURT: That would give us -- if discovery ends on the 7th, that would give -- because he can mail -- well, I guess the question, Mr. Eyre, are you going to send out your --

do you anticipate not being able to send out -- you already filed the plan.

MR. EYRE: Right.

THE COURT: So is the discovery for the plan or is it in connection with this motion for relief?

MR. EYRE: I don't -- I think the discovery -- I don't see any difference between the discovery on the plan versus the motion for relief. And so I think we're okay there. I don't think we need separate discovery. I guess other parties could theoretically ask for --

THE COURT: No, no, no, no, no. I wasn't saying if they're separate. I'm trying to figure out when is the latest you can send out the plan?

MR. EYRE: Right.

THE COURT: Because maybe there will be some changes to your plan as a result of the discovery that would require you to file an amended plan, and then what would you be sending out? If you're going to send out the plan you have now, and don't anticipate that discovery is going to have anything to do with that, you can send it out in enough time for people to vote on the 31st. Which would be July 3rd or June 30, or whatever that Friday is. June 30th. That's why I'm asking.

MR. EYRE: I would ask that we do that. And I -- and we're going to make every effort to make that work. So let's do that.

THE COURT: All right. So June 30th is the deadline for sending out the solicitation. July 31st is the deadline for ballot and objection. A report of plan voting is due August 2nd, and a confirmation hearing on August 9th at 1 p.m. And discovery will end on July 7th. So everybody has those dates?

MR. EYRE: Yes, Your Honor.

MR. CANAS: Yes, Your Honor.

THE COURT: And counsel for Wilmington, June 9th is the deadline for responding to your motion. So you'll send out a notice saying deadline to respond June 9th, 5 p.m. Hearing on the motion, August 9th at 1 p.m.

MR. CANAS: Yes, Your Honor. Thank you.

THE COURT: And then Mr. Eyre, you'll send out -- you'll submit an order with the deadlines. I just gave you the order. And then we'll have those. And then you guys want this in person or do you want this by Zoom?

MR. EYRE: I think I would prefer in person, Your Honor. But you know --

THE COURT: It's up to counsel for Wilmington. Do you want it in person or you want --

MR. CANAS: That's fine, Your Honor.

THE COURT: And we won't issue no Zoom order, Eileen.

COURTROOM DEPUTY: Okay.

(Proceedings adjourned at 10:42 a.m.)

**C E R T I F I C A T I O N**

I, John Buckley, court approved proofreader, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

John Buckley

John Buckley, CET 623

Date: June 9, 2023